UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| TRUSTEES OF THE GRAPHIC COMMUNICATIONS INTERNATIONAL UNION UPPER MIDWEST LOCAL 1-M HEALTH AND WELFARE PLAN, | Civil No. 04-3371 (PJS/JJG) |
| Plaintiffs, | |
| v. | MEMORANDUM OPINION AND ORDER |
| OLAF BJORKEDAL and TAMARA BJORKEDAL, | |
| Defendants. | |

Ruth S. Marcott, FELHABER LARSON FENLON & VOGT, PA, 220 South Sixth Street, Suite 2200, Minneapolis, MN 55402, for plaintiffs.

Corey J. Ayling, McGRANN SHEA ANDERSON CARNIVAL STRAUGHN & LAMB, CHTD, 800 Nicollet Mall, Suite 2600, Minneapolis, MN 55402, for defendants.

Nordic Press, Inc. ("Nordic Press") was founded in 1968.  A union employer almost from the start, Nordic Press soon began making contributions to the multi-employer Graphic Communications International Union Upper Midwest Local 1-M Health and Welfare Fund ("the Fund").  In 1988, Nordic Press and other participating employers signed an Adoption Agreement with the Fund ("the Adoption Agreement") — an agreement that, among other things, imposed liability on any employer who withdrew from the Fund.  Years later, Nordic Press (by then called "Nordic Printing & Packaging, Inc." or "P&P"[1]) experienced financial difficulties.

---

[1]Except when necessary to refer specifically to Nordic Press, the Court will refer to Nordic Press and P&P together as "P&P."

Beginning in March 2003, P&P stopped contributing to the Fund, and P&P also failed to remit premium payments that had been withheld from the paychecks of P&P employees.

There is no question that P&P is liable to the Fund for the premium payments that were withheld from employees' paychecks but not forwarded to the Fund. There is also no question that, when P&P stopped contributing to the Fund, it incurred withdrawal liability under the 1988 Adoption Agreement. The problem is that P&P went bankrupt in September 2003, so it cannot pay its debts to the Fund.

Undeterred, plaintiffs Trustees of the Graphic Communications International Union Upper Midwest Local 1-M Health and Welfare Plan ("Trustees") now seek to hold the owners of P&P — Olaf Bjorkedal ("Bjorkedal") and his wife Tamara Bjorkedal (collectively "the Bjorkedals") — personally liable for P&P's corporate debts. The Trustees bring three claims against the Bjorkedals: breach of contract, breach of fiduciary duty, and alter ego/piercing the corporate veil. The Bjorkedals have moved for summary judgment on all three of the Trustees' claims, and the Trustees have responded by moving for summary judgment on their breach-of-contract and breach-of-fiduciary-duty claims.

## I. BACKGROUND

Olaf Bjorkedal and his friend Harry Jacobson incorporated Nordic Press in 1968; each owned half of the company's stock. Bjorkedal Dep. 21, 28. Nordic Press's business consisted primarily of creating high-quality promotional display materials. Bjorkedal Dep. 42. The display materials had to be die cut. Initially Nordic Press had the die cutting done by outside firms. Bjorkedal Dep. 43. But, because Nordic Press's customers required fast turnarounds, Bjorkedal and Jacobson decided to purchase Fitco Paper Box, Inc. and take the die-cutting work

in house.  Bjorkedal Dep. 25, 42-43.  Fitco Paper Box, Inc. was eventually renamed Nordic Packaging.[2]  Bjorkedal Dep. 25.

In addition to Nordic Press and Nordic Packaging, Bjorkedal eventually created two other Nordic companies:  Nordic Pak and Nordic Leasing.  Bjorkedal Dep. 41-42.  Nordic Pak was started in the early 1970s to provide short-term, seasonal workers that would pack printed promotional display kits.  Bjorkedal Dep. 41, 46-47.  Nordic Leasing (unlike its three sister companies) was not directly involved in the printing side of the business.  Instead, Nordic Leasing was formed to lease cars and specialized equipment to other companies and individuals. Bjorkedal Dep. 51-53; Perkins Dep. 33.

Nordic Press grew quickly and by 1969 had 10 to 15 employees.  Bjorkedal Dep. 26.  By all accounts, Nordic Press was a successful company.  Over its lifetime, it employed hundreds of workers, collected tens of millions of dollars in revenues, and served many blue-chip corporate clients, including Pillsbury, Hamm's Brewery, Fingerhut, Gamble-Skogmo, Lunds, and 3M. Bjorkedal Dep. 21, 42, 45-46; Foster Dep. 16, 69.  At their peak, the Nordic companies combined had about 160 employees, Perkins Dep. 34, and annual revenues of approximately $25 million, Vander Plaats Dep. Ex. 2 at D00237.

Both Bjorkedal and Jacobson were working owners.  Bjorkedal worked in sales and production, while Jacobson worked mainly in management and finance.  Bjorkedal Dep. 48-49. In the beginning, Bjorkedal and Jacobson were the only members of Nordic Press's board of directors, but, over the years, the membership of the board grew to include several other people,

---

[2]For ease of reference, the Court will refer to Fitco Paper Box, Inc. and Nordic Packaging as "Nordic Packaging."

including people outside of the Bjorkedal and Jacobson families.  Bjorkedal Dep. 35-36.  One of those individuals was Al Vander Plaats, whom Bjorkedal originally hired to be the general manager of Nordic Packaging.  Bjorkedal Dep. 27, 35.  By 1970, Vander Plaats was the financial controller and secretary for all four Nordic companies.  Later he acquired stock in Nordic Pak and Nordic Leasing.  Vander Plaats Dep. 11, 21, 30-31.  Other than the stock owned by Vander Plaats, all of the stock in the four Nordic companies was owned by Bjorkedal, Jacobson, and members of their families.  Bjorkedal Dep. 59-60.

The Bjorkedals and Jacobsons also owned other investments and property, including two buildings that they leased to the Nordic companies.  *See* Bjorkedal Dep. Exs. 8-11 (lease agreements).  In the early 1970s, Bjorkedal built and assumed ownership of a warehouse located at 5017 Boone Avenue in New Hope, Minnesota ("the Boone Avenue building").  Bjorkedal Dep. 40.  Eventually the Bjorkedals and Jacobsons co-owned this building.  Bjorkedal Dep. 116.  The Bjorkedals and Jacobsons leased space in the building to all four Nordic companies.  Bjorkedal Dep. Exs. 8, 9; Vander Plaats Dep. 12-13.  In 1990, the Bjorkedals and Jacobsons purchased a building located at 8501 54th Avenue North in New Hope ("the 8501 building") and leased space in this building to Nordic Packaging and Nordic Pak.  Bjorkedal Dep. 107-08 & Exs. 10, 11.

The Trustees have done much in the course of this litigation to confuse the status of these buildings.  For example, in their briefs the Trustees repeatedly refer to a "Building Entity," implying that a separate corporation owned and ran the buildings.  It is clear, though, that the buildings were the personal assets of the Bjorkedals and Jacobsons.  The buildings were purchased with their own personal funds; the mortgages were signed by them personally; when

the buildings were rented out, the leases were signed by them personally; the debts incurred in running the buildings were their personal responsibility; and the income generated by the buildings was reported as personal income on their personal tax returns.  The Bjorkedals and Jacobsons personally owned the buildings, just as they personally owned, say, the televisions that they watched at home in the evenings or the kitchen tables on which they ate breakfast in the mornings.  Referring to a "Building Entity" is as misleading as referring to a "Television Entity" or "Kitchen-Table Entity."  The Bjorkedals and Jacobsons owned buildings, period.  They did not own an "entity" that owned buildings.

As noted, the Bjorkedals and Jacobsons leased their buildings to the Nordic companies. The Bjorkedals and Jacobsons consistently charged the Nordic companies below-market rent. The families hoped merely to receive enough in rent to cover the mortgage, taxes, and other expenses, so that the families did not lose money on the buildings.  When the companies were short of cash, the Bjorkedals and Jacobsons sometimes allowed the companies to skip their rent payments altogether.  On those occasions, the families paid the mortgage out of their own pockets.  Bjorkedal Dep. 117, 122-23; Vander Plaats Dep. 17, 38, 73; Foster Dep. 118-19.  In other words, far from using the buildings to siphon cash from the companies, the Bjorkedals and Jacobsons used the buildings as a means of infusing their own cash into the companies.

When the companies were able to pay rent, those payments were deposited into a bank account that the parties refer to as the "Jacobson-Bjorkedal Building Account."  Vander Plaats Dep. 18.  Mortgage and tax payments for the buildings were made from that account.  Although, as noted, the money in that account belonged personally to the Bjorkedals and Jacobsons — and although checks written on that account paid the personal debts of the Bjorkedals and Jacobsons

— Vander Plaats (and other Nordic Press employees) handled that account and took responsibility for ensuring that mortgage and tax payments were made.  Vander Plaats Dep. 19. The Nordic companies did not charge the Bjorkedals or Jacobsons for Vander Plaats's services in handling the Jacobson-Bjorkedal Building Account.  Vander Plaats Dep. 69.

Jacobson died in 1993.  Vander Plaats Dep. 20.  Prior to that time, Bjorkedal held the positions of president of Nordic Packaging and Nordic Leasing, and treasurer of Nordic Press and Nordic Pak.  Vander Plaats Dep. 20-21.  After Jacobson's death, Bjorkedal became president of all four companies, and Jacobson's Nordic stock and interest in the two buildings went into a trust of which Jacobson's wife was a trustee.  Vander Plaats Dep. 21, 28-29.  In 1997, a Nordic employee named Bruce Bonine became president and CEO of all four Nordic companies. Marcott Letter, July 21, 2006, Ex. 1 at 4 (spreadsheet listing history of corporate officers).  In 2002, the various Nordic entities were combined into P&P,  Foster Dep. 39, Bjorkedal Dep. 93, and Bjorkedal became CEO and president of the new company.  Marcott Letter, July 21, 2006, Ex. 1 at 4.  At that time, Bjorkedal purchased the Jacobson family's interest in the Nordic companies and the Boone Avenue building, and the families sold the 8501 building.  Bjorkedal Dep. 108-109; Foster Dep. 39.  A year later, P&P filed for bankruptcy.

Nordic Press became a union shop in the early 1970s.  Bjorkedal Dep. 69-70.  Over the next quarter century, Vander Plaats handled contract negotiations with the union on Nordic Press's behalf.  Bjorkedal had no involvement.  Bjorkedal Dep. 71-72.  Nordic Packaging was unionized when Bjorkedal and Jacobson purchased it, and Vander Plaats also represented that company in negotiations with the union.  Bjorkedal Dep. 70, 75.  In 1988, Vander Plaats signed the Adoption Agreement with the Fund on behalf of Nordic Press.  Bjorkedal Dep. Ex. 2.

Among other things, the Adoption Agreement imposed liability on employers who withdrew

from the Fund.  Bjorkedal Dep. Ex. 2 at GCIU-00138-39.

Nordic Press began experiencing serious financial difficulties in the late 1990s.  After

Vander Plaats retired, Dave Mackay replaced him as CFO, and Bonine became president of the

corporation.  Bjorkedal Dep. 80-82.  In Bjorkedal's opinion, Mackay and Bonine were

incompetent (especially when compared to Vander Plaats) and caused Nordic Press to lose a

substantial amount of business.  Bjorkedal Dep. 80, 83-84.  The financial condition of the

company continued to deteriorate, and eventually, at the behest of the company's bank, Nordic

Press agreed to work with Alliance Business Management ("Alliance"), a consulting firm.

Foster Dep. 14, 21.

Alliance hired DeeDee Foster as controller in August 2001 and ultimately fired Mackay

and Bonine.  Bjorkedal Dep. 87; Foster Dep. 10, 12, 13-14, 21.  By the time Foster was hired, the

financial management of the company was in disarray, Foster Dep. 17-20, and Alliance told

Foster that, if she did a good job, she could replace Mackay as CFO.  Foster Dep. 17.  Bjorkedal

did not even meet Foster until several months after she was hired, Foster Dep. 19, and it does not

appear that Bjorkedal had any input into the decision to hire her, Foster Dep. 14.  After several

months, Foster was essentially running Nordic Press, Foster Dep. 20, and she began working

closely with Bjorkedal, Foster Dep. 24.

Nordic Press lost a large account worth about $6 million shortly before Foster was hired,

Foster Dep. 15-16, and, within a year after Foster's hiring, the company lost another large

account, Foster Dep. 68.  Business apparently went downhill rapidly after that.  Foster Dep. 69.

In March 2003, the company stopped making payments to the Fund for health and welfare

benefits, including amounts withheld from employee paychecks for that purpose.  Foster Dep.

72-73.  P&P failed to make a total of $81,445.00 in required contributions to the Fund,

Knoblauch Aff. ¶ 3, including $6,440.00 in contributions withheld from employee paychecks,

Pls.' Mem. Supp. Partial Summ. J. 14; Osgood Aff. ¶ 8.  The company filed for bankruptcy on

September 3, 2003.  Foster Dep. 73.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the

outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a

reasonable jury could . . . return a verdict for [the non-movant]."  *Baucom v. Holiday Cos.*, 428

F.3d 764, 766 (8th Cir. 2005).

In considering a motion for summary judgment, a court must resolve factual disputes in

favor of the nonmoving party.  *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*,

824 F.2d 582, 585 (8th Cir. 1987).  But before a factual dispute can be resolved in favor of the

nonmovant, the nonmovant must first *create* a factual dispute.  Rule 56(e) "requires the

nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions,

answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is

a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R.

Civ. P. 56(e)).

The nonmovant must present enough facts "to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Id*. at 322.  Evidence is not "sufficient" unless a reasonable jury could

return a verdict for the nonmovant.  "Where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary

judgment must be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986) (quoting Fed. R. Civ. P. 56(e)).

## B.  Breach of Contract

The goal of the Trustees in this litigation is to find a way to hold the Bjorkedals

personally liable for the debt that P&P owes to the Fund.  As an initial matter, the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., is of no help to

the Trustees.  The Fund is a multi-employer welfare-benefit plan, as defined by ERISA.  *See*

Am. Comp. ¶¶ 2-4; Pls.' Mem. Supp. Partial Summ. J. 2; *see also* 29 U.S.C. § 1002(1) (defining

"employee welfare benefit plan").  ERISA imposes withdrawal liability on employers who

withdraw from multi-employer pension plans, 29 U.S.C. § 1381, but it does not impose such

liability on employers who withdraw from multi-employer welfare-benefit plans.  *See*

*Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Indus. Fund*, 967

F.2d 688, 694 n.8 (1st Cir. 1992); *Trs. of the Graphic Commc'ns Int'l Union Local 546 Health &*

*Welfare Fund v. Lith-o-kraft Plate Co.*, 692 F. Supp. 782, 787-88 (N.D. Ohio 1988).

There is a reason for this.  ERISA requires that pension plans meet minimum vesting requirements, 29 U.S.C. § 1053, but it does not mandate vesting for welfare-benefit plans, 29 U.S.C. § 1051(1).  The liability that ERISA imposes on employers who withdraw from pension plans is intended to require employers to pay their share of the unfunded vested benefits.  *See Mfrs.' Indus. Relations Ass'n v. E. Akron Casting Co.*, 58 F.3d 204, 205 (6th Cir. 1995).  But since welfare-benefit plans are not vested absent a contractual agreement to the contrary, there usually will not be any unfunded vested benefits in need of funding.  Congress thus chose not to impose withdrawal liability on employers who withdraw from welfare-benefit plans.  For that reason, neither P&P nor the Bjorkedals have withdrawal liability to the Fund under ERISA.

Of course, an employer can choose to enter a contract with a union and, through that contract, voluntarily assume withdrawal liability to a welfare-benefit plan.  That is precisely what Nordic Press did when it executed the Adoption Agreement.  It is uncontested that Vander Plaats signed the Adoption Agreement on behalf of Nordic Press in 1988, that P&P (the corporate successor to Nordic Press) withdrew from the Fund in 2003, and thus that P&P incurred withdrawal liability under the Adoption Agreement.  Obviously, if the Trustees are successful in piercing the corporate veil between P&P and the Bjorkedals — an issue addressed below — then the Bjorkedals will be held responsible for P&P's withdrawal liability under the Adoption Agreement.  But the Trustees argue that, even if the corporate veil is not pierced, the Bjorkedals can still be held personally liable.

The Trustees' argument focuses on the definition of "employer" in the Adoption Agreement.  That term is not directly defined in the Adoption Agreement; instead, the contract

incorporates by reference the broad definition of "employer" found in a provision of ERISA.

Specifically, the Adoption Agreement states:

> [T]he term "employer" shall be as defined in ERISA Section 4001(b)(1).  In cases of common control, all trades or businesses which are under common control as defined in Internal Revenue Code Section 414(c) will be considered as a single employer.

Bjorkedal Dep. Ex. 2 at GCIU-00139.  Section 4001(b)(1), in turn, provides in relevant part:

> [A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.  The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

29 U.S.C. § 1301(b)(1).  Finally, Section 414(c) of the Internal Revenue Code provides in

relevant part:

> [A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer.

26 U.S.C. § 414(c); *see also* 26 C.F.R. § 1.414(c)-2(c) (defining "brother-sister" groups of trades

or businesses under common control).

The Trustees' argument that the Bjorkedals are personally liable under the Adoption

Agreement gets convoluted at times, but essentially it is as follows:  The Adoption Agreement

imposes liability on an "employer" who withdraws from the Fund and incorporates the broad

definition of "employer" found in § 4001(b)(1) of ERISA and § 414(c) of the IRC.  The

"Building Entity" and the four Nordic companies were each a "trade or business."  Each of those

"trades or businesses" was under the "common control" of Bjorkedal (who owned the "Building

Entity" and the companies) and Vander Plaats (who managed the "Building Entity" and the

companies).  The "Building Entity" and the four Nordic companies must therefore be "treated as

. . . a single employer."  When P&P (the successor to the four Nordic companies) withdrew from

the Plan and incurred withdrawal liability, so did the "Building Entity."  Hence the "Building

Entity" — which is another way of saying "the Bjorkedals" — has withdrawal liability to the

Fund.

One major problem with this argument is that there is no "Building Entity."  As described

above, the buildings rented to the Nordic companies were not owned by any entity; they were

owned by the Bjorkedals and Jacobsons.  The Trustees' attempt to create a building-owning

business out of thin air borders on deceptive at times.  For example, at one point in their brief,

the Trustees assert that "Bjorkedal was able to profit handsomely . . . from the sale of the

Building Entity's assets."  Pls.' Mem. Opp. Defs.' Summ. J. 26.  What the Trustees are referring

to here is the sale by Bjorkedal of a building that he owned; the notion that Bjorkedal profited

from the sale of an "asset[]" held by a "Building Entity" is something that the Trustees simply

made up.  At another point in their brief, the Trustees argue that "Bjorkedal is liable as the alter

ego of P&P and the Building Entity."  *Id.* at 28.  In theory, Bjorkedal could be deemed the alter

ego of P&P, which at least existed.  But the Trustees do not explain how Bjorkedal could be

deemed the alter ego of a non-existent "Building Entity."  Given that the building was owned by

Bjorkedal personally, the Trustees seem to be arguing that Bjorkedal can be held liable as the

alter ego of Bjorkedal.  Finally, the Trustees argue that "neither the Bjorkedals nor the Building

Entity ever sought bankruptcy protection."  *Id.* at 31.  Again, though, there is no "Building

Entity," except in the imagination of the Trustees.  There is only a building — bricks and mortar owned by two human beings — and buildings cannot file for bankruptcy protection.[3]

There is another serious problem with the Trustees' attempt to hold the Bjorkedals liable under the Adoption Agreement:  The Bjorkedals never signed the agreement.  Two parties can say whatever they like in a contract, but if the contract is to be enforced against a third party, that third party needs to sign it.  Had they wanted, Nordic Press and the Fund could have defined "employer" in the Adoption Agreement to include "Nordic Press and William Gates III."  But, unless Mr. Gates signed the agreement, the Fund is not going to have much luck enforcing it against him.

The signature page of the Adoption Agreement states that "[t]he undersigned employer . . . hereby adopts and agrees to be bound by the Rules and Regulations of the Trustees of the Fund."  Bjorkedal Dep. Ex. 2 at GCIU-00141.  Over "Name of Employer," the name "Nordic Press, Inc." is printed.  *Id*.  The Adoption Agreement identifies Vander Plaats as a corporate officer — "V.P. Secretary" — signing on behalf of the "Contributing Employer."  *Id*.  In other words, the signature page of the Adoption Agreement clearly establishes that Vander Plaats signed the Adoption Agreement in his capacity as an officer of Nordic Press and that the contract is between the Fund and Nordic Press.[4]  Nordic Press and its successor P&P are legal entities

---

[3]It is worth noting, though, that because the Boone Avenue building was owned by the Bjorkedals personally, and not by P&P, it was not part of P&P's bankruptcy estate.  The Bjorkedals ultimately sold the Boone Avenue building in March 2005.  Bjorkedal Dep. 108, 112.

[4]As they do with respect to other issues, the Trustees try to obfuscate this issue, such as when they refer to the Bjorkedals as having "entered into the Agreement," Pls.' Reply Mem. Supp. Partial Summ. J. 1, while citing cases imposing statutory (not contractual) withdrawal liability in the pension (not welfare-benefit) plan context, *see, e.g.*, Pls.' Mem. Supp. Partial Summ. J. 19 (citing *Vaughn v. Sexton*, 975 F.2d 498 (8th Cir. 1992)).

independent of the Bjorkedals.  Unless the corporate veil is pierced, the shareholders and officers of a corporation are not liable for the corporation's debts.  *See Milwaukee Motor Transp. Co. v. Comm'r of Taxation*, 193 N.W.2d 605, 608 (Minn. 1971); *Corcoran v. P.G. Corcoran Co.*, 71 N.W.2d 787, 795 (Minn. 1955); *Rommel v. New Brunswick Fire Ins. Co.*, 8 N.W.2d 28, 32 (Minn. 1943); *see also Rockney v. Blohorn*, 877 F.2d 637, 643 (8th Cir. 1989) ("We hold that corporate officers cannot be held personally liable under ERISA where there is no basis for piercing the corporate veil."); *Pipe Fitters Health & Welfare Trust v. Waldo, R., Inc.*, 969 F.2d 718, 720-21 (8th Cir. 1992) (1992) (citing *Rockney*).

There is absolutely no evidence that, when Vander Plaats signed the Adoption Agreement on behalf of Nordic Press, he was authorized also to bind the Bjorkedals personally, that he intended to bind the Bjorkedals personally, or that the Fund understood him to be binding the Bjorkedals personally.  The Trustees point out that Vander Plaats helped manage the Bjorkedals' real estate holdings and had authority to sign checks drawn on the Jacobson-Bjorkedal Building Account.  That is true, but the fact that Vander Plaats was authorized to represent the Bjorkedals in connection with *some* things does not mean that he was authorized to represent the Bjorkedals in connection with *all* things.  Just because the Bjorkedals authorized Vander Plaats to write checks on the Jacobson-Bjorkedal Building Account does not mean that the Bjorkedals also authorized Vander Plaats to commit them to pay withdrawal liability under the Adoption Agreement.  The one has nothing to do with the other.  Moreover, even if the Bjorkedals gave Vander Plaats carte blanche to legally bind them in any way he wished (which they did not, of course), there is no evidence that Vander Plaats was *exercising* that authority when he signed the Adoption Agreement.  *See Powell v. MVE Holdings, Inc.*, 626 N.W.2d 451,

-14-

457 (Minn. Ct. App. 2001) ("In determining whether apparent authority exists, the court may consider any statements, conduct, lack of ordinary care, or manifestations of the principal's consent, such that a third party might be justified in concluding that the agent acted with apparent authority.").

The Trustees also note that Vander Plaats discussed the Adoption Agreement with Bjorkedal, *see* Pls.' Mem. Supp. Partial Summ. J. 7, and that Bjorkedal acknowledged that Vander Plaats had the authority to sign the Adoption Agreement on Nordic Press's behalf, *see* Bjorkedal Dep. 75-76.  But this is entirely consistent with Vander Plaats's and Bjorkedal's roles as corporate officers and directors of Nordic Press.  It in no way suggests that, when Vander Plaats signed the Adoption Agreement, he was binding not only Nordic Press the corporation, but also Bjorkedal the person.  Similarly, the fact that, years after the Adoption Agreement was signed, Foster discussed P&P's potential withdrawal liability with Bjorkedal, that Bjorkedal was aware of such liability, and that Bjorkedal knew of potential personal liability to a separate pension fund (of which he was a trustee and fiduciary, Foster Dep. 85) is simply irrelevant to the issue of whether the Bjorkedals were personally bound by the Adoption Agreement.

Taking advantage of the fact that the parties' cross-motions for summary judgment gave them the opportunity to brief the same issues several times over, the Trustees rather half-heartedly try a number of other arguments.  For example, the Trustees argue that "P&P and the Building Entity together constitute a joint venture/joint enterprise . . . because . . . the entities were run in lockstep, with the common purpose of enhancing Bjorkedal's enterprise."  Pls.' Mem. Opp. Defs.' Summ. J. 20.  Under Minnesota law, four requirements must be met in order to create a joint venture:  (1) contribution by all parties; (2) joint proprietorship and control;

(3) sharing of profits; and (4) a contract. *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 332 (Minn. 2004). A joint enterprise is similar, but does not require a "business relationship" (or, in other words, a sharing of profits or a contract). *Mellett v. Fairview Health Servs.*, 634 N.W.2d 421, 424 (Minn. 2001).

The Trustees' amended complaint does not specifically refer to a joint venture or joint enterprise, and thus it is doubtful that these claims were plead with sufficient particularity. *See* Fed. R. Civ. P. 8(a)(2). Even if they were, the claims cannot survive summary judgment. Again, there is no "Building Entity"; it is a figment of the Trustees' imagination. P&P obviously could not have been engaged in a joint venture or joint enterprise with something that does not exist. The Trustees' argument fares no better if their reference to the "Building Entity" is deemed to be a reference to "the Bjorkedals as owners of the buildings." The relationship between P&P and the Bjorkedals as the owners of the buildings was one of landlord-tenant. This relationship does not create a joint venture or joint enterprise. *See Roberts v. Donaldson*, 149 N.W.2d 401, 407 (Minn. 1967) (discussing general joint venture principles); *Mills v. Oberg*, No. A04-1262, 2005 WL 221971, at *3 (Minn. Ct. App. Feb. 1, 2005) (affirming grant of summary judgment on joint venture and joint enterprise claims where the relationship was not "anything other than that of landlord-tenant").

The Trustees also argue that "the Building Entity" was operated as a "mere agency or arm" of Nordic Press. *See Langford Tool & Drill Co. v. Phoenix Biocomposites, LLC*, 668 N.W.2d 438, 447 (Minn. Ct. App. 2003) ("Minnesota law states that a subordinate corporation which has no purpose or existence apart from the operation of its cooperative owners may be considered merely an agency or arm of the parent."). It is unclear exactly what this principle

could mean in the context of this case, especially when there is no "Building Entity," but only the Bjorkedals as the owners of the buildings.  Obviously, the Bjorkedals were not operated as a "mere agency or arm" of Nordic Press; the Bjorkedals owned Nordic Press.  Even if the Bjorkedals were corporations instead of human beings, and even if they were subsidiaries of Nordic Press, the Trustees do not explain how, under Minnesota law, a subsidiary can be held responsible for the contractual obligations of its parent.

Finally, the Trustees contend that Bjorkedal ratified the Adoption Agreement by accepting the benefits of it.  *See Centennial Ins. Co. v. Zylberberg*, 422 N.W.2d 18, 21 (Minn Ct. App. 1988) ("Ratification occurs when one having full knowledge of all material facts confirms, approves or sanctions a previous act done on behalf of the principal without authority.").  As discussed previously, though, there is no evidence that Vander Plaats was attempting to act on behalf of the Bjorkedals personally when he signed the Adoption Agreement, so there was no unauthorized action by an agent for the Bjorkedals to ratify.  In addition, the Trustees do not explain how, exactly, Bjorkedal accepted the benefits of the Adoption Agreement.  Bjorkedal was a shareholder and officer of Nordic Press.  The shareholders and officer of every corporation could be said to benefit from the contracts that the corporation signs, but that does not mean that they are personally liable on those contracts.

The Trustees have grasped at many straws, but they have failed to come up with a single plausible basis for holding the Bjorkedals liable under the Adoption Agreement.  All of the evidence in this record points to the obvious:  The Adoption Agreement binds only P&P (as successor to Nordic Press), and not the Bjorkedals personally.  The Bjorkedals are entitled to summary judgment on the Trustees' breach-of-contract claims.

-17-

## C.  Breach of Fiduciary Duty

The Trustees allege that Olaf Bjorkedal violated a fiduciary duty to the Fund by failing to make P&P's required employer contributions and by failing to remit premiums that had been withheld from employee paychecks.  Both sides seek summary judgment on this claim.

Under 29 U.S.C. § 1002(21)(A), an individual (such as Bjorkedal) is a fiduciary with respect to a welfare-benefit plan (such as the Fund) only "to the extent [that] he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets."  There are two critical phrases here.

The first is "to the extent."  Congress recognized that a plan fiduciary such as Bjorkedal may have financial interests adverse to those of plan beneficiaries such as the P&P employees.  For that reason, ERISA defines individuals as fiduciaries only "to the extent" that they "exercise[] any discretionary authority or discretionary control respecting management of such plan or exercise[] any authority or control respecting management or disposition of its assets."  *See Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000).  There is no allegation that Bjorkedal had anything to do with managing the Fund.  Instead, the Trustees' breach-of-fiduciary-duty claim relates to the managing or disposing of Fund assets — in particular, the premiums that P&P withheld from the paychecks of union members but did not forward to the Fund and the employer contributions that P&P owed to the Fund.

The second critical phrase is "exercises."  To hold Bjorkedal liable, the Trustees must show more than that he had "authority or control respecting management or disposition of its assets."  The Trustees must also show that Bjorkedal actually "exercise[d]" that authority or

control — that he personally decided that P&P would not forward the withheld premiums or employer contributions to the Fund.

This the Trustees cannot do.  There is no evidence that Bjorkedal exercised any authority or control over the withheld employee premiums or P&P's unpaid employer contributions.  To the contrary, the evidence is clear that Bjorkedal left the management and disposition of those funds to Vander Plaats, Mackay, and Foster.  Bjorkedal Dep. 79-80.  Bjorkedal testified that Foster handled the financial end of the business, and that his responsibility was to generate business.  Bjorkedal Dep. 96.  When P&P filed for bankruptcy, Bjorkedal asked Foster if the company was "all paid up with the union," and she said "yes."  Bjorkedal Dep. 100-01.  Foster did let Bjorkedal know when the cash situation in the company was particularly dire, Foster Dep. 24, 68, 70-71, but Bjorkedal did not get involved in discussions of which bills should be paid and which should not, Foster Dep. 72.  In particular, Foster testified very pointedly that Bjorkedal never tried to interfere with her management of P&P's finances.  As the Trustees repeatedly cite Foster's testimony in support of their claim, it is worth quoting the relevant testimony in full:

> Q. At any time when you were consulting Ole [Bjorkedal] about any kind of financial matters, did you always consider that he had veto power?  He could have said no, don't pay this, or no, don't do this?  Do you consider that he had vote to [sic] power?
>
> A. I did, but Ole was — he knew that I was better at it than he was.  He knew that he couldn't get away with stuff.  If he ever tried to take money for himself personally, I stopped him from doing that.  And he never did because he knew that I'd just flat out say no and I'd get in his face and tell him he wasn't allowed to do that.  So he may have had veto power in title, but I would really — I drove it, he didn't.
>
> Q. You always realized, though, that he was at least president and CEO in title?
>
> A. Correct.

Q.      And you always kept him informed?

A.      I didn't tell him who was paid getting [sic] and who wasn't, but he knew
        how bad the cash situation was in those months.

Foster Dep. 78.  Far from demonstrating that Bjorkedal exercised authority or control over plan

assets, this testimony establishes just the opposite:  Although Bjorkedal, as president and CEO of

P&P, had veto power over all payments "in title," he did not actually exercise that authority or,

for that matter, even *know* "who was [getting paid] and who wasn't."

In the face of a complete lack of evidence that Bjorkedal himself ever exercised authority

or control over plan assets, the Trustees again grasp at straws.  For example, the Trustees point to

evidence that P&P continued to pay rent on the Boone Avenue building (at this point, P&P was

technically making the mortgage payments on the building for the Bjorkedals instead of paying

rent to the Bjorkedals, Foster Dep. 66), that Bjorkedal knew that P&P was facing withdrawal

liability under the Adoption Agreement, Foster Dep. 82, and that, during its final months, P&P

chose to devote what funds it had first to payroll and then to raw materials.  In Foster's words,

"if there was any money left over it . . . [went to] whoever was suing us, which was happening

quite frequently."  Foster Dep. 72.

It is not clear how these facts — either individually or in combination — suggest that

Bjorkedal breached a fiduciary duty to the Fund.  Presumably the Trustees mean to imply that

Bjorkedal must have been the moving force behind all of these decisions, particularly in the case

of the mortgage payments, as he was an owner of the Boone Avenue building.  But this is

conjecture, not evidence, and there is no evidence that this conjecture is true.  Nor, for that

matter, is there anything insidious about the fact that P&P made mortgage payments on the

Boone Avenue building in lieu of paying rent.  The rent had always been set at a below-market

rate intended merely to cover the mortgage, taxes, and maintenance.  Vander Plaats Dep. 38, 73.

In other words, the Bjorkedals sought not to enrich themselves by renting the building to P&P,

but simply not to lose money.  Considering that P&P was struggling for survival and was

enjoying a very favorable lease arrangement, P&P had a legitimate business interest in making

the mortgage payments necessary to keep the bank from foreclosing on the building and either

evicting P&P or raising P&P's rent.

In essence, the Trustees' argument boils down to this:  Bjorkedal *could* have exercised

authority and control over plan assets, and he *could* have ordered Foster to make payments to the

Fund instead of covering payroll or rent, and thus Bjorkedal should be held personally liable to

the Fund.  In other words, the Trustees end up relying on the mere fact that Bjorkedal was an

officer of the corporation.  But, as noted, ERISA provides that an officer is a fiduciary only "to

the extent [that] he . . . *exercises* any authority or control respecting management or disposition

of [plan] assets."  29 U.S.C. § 1002(21)(A) (emphasis added); *see also* 29 C.F.R. § 2509.75-8 at

D-5 (status as a corporate officer of a fiduciary corporation is insufficient by itself to create

fiduciary duty).  Bjorkedal did not exercise authority or control over the Fund's assets.

In *Confer v. Custom Engineering Co.*, 952 F.2d 34, 37 (3d Cir. 1991), the Third Circuit

held that, even when a corporation is itself formally designated as the fiduciary of an ERISA

plan, the officers of that corporation do not become fiduciaries of the plan when they perform the

fiduciary functions of the corporation.  *See also Prof'l Helicopter Pilots Ass'n v. Denison*, 804 F.

Supp. 1447, 1451 (M.D. Ala. 1992) (same).  *Confer* has come in for a fair bit of criticism.  *See,*

*e.g., Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1459-60 (9th Cir. 1995); *Chao v. Crouse*, 346 F.

Supp. 2d 975, 984-85 (S.D. Ind. 2004); *Bell v. Executive Comm. of United Food and*

*Commercial Workers Pension Plan*, 191 F. Supp. 2d 10, 14-15 (D.D.C. 2002).  None of these cases indicates, though, that an officer of such a corporation becomes a plan fiduciary merely by reason of his corporate status.  Rather, these cases call for a "factual determination involving an assessment of the extent of responsibility and control exercised by the individual with respect to the Plan."  *Bell*, 191 F. Supp. 2d at 15.

These cases do not help the Trustees in their pursuit of Bjorkedal.  For one thing, the evidence in this case establishes that Bjorkedal did not exercise authority over Fund assets.  For another, the cases criticizing *Confer* are distinguishable in that they involve officers acting within and on behalf of corporations that were formally designated as fiduciaries of an ERISA plan.  *See Kayes*, 51 F.3d at 1458-59; *Crouse*, 346 F. Supp. 2d at 983; *Bell*, 191 F. Supp. 2d at 15.  But there is no evidence that P&P was a named fiduciary of the Fund.  To find for the Trustees, the Court would have to hold that every officer of every corporation that makes contributions to a multi-employer ERISA plan automatically becomes a fiduciary of the plan because the officer could theoretically exercise authority and control over the corporation's funds and the corporation's funds could theoretically be considered "plan assets."  No case — not even the cases criticizing *Confer* — has gone so far.

The Trustees also compare this case to *Iron Workers' Local No. 25 Pension Fund v. McGuire Steel Erection, Inc.*, 352 F. Supp. 2d 794 (E.D. Mich. 2004).  That case is indeed instructive, but not in a way that helps the Trustees.  In *McGuire Steel*, the court found that the company's president, Dan McGuire, acted as a fiduciary with respect to plan assets because he actually exercised day-to-day control over the operations of the company, including the decision whether to pay contributions owed to the ERISA plan.  *Id.* at 805.  Similarly, in *Phelps v. C T*

*Enterprises Inc.*, 394 F.3d 213, 221 (4th Cir. 2005), the Fourth Circuit held that individual

corporate officers can be held liable for breach of fiduciary duty when they direct that

employees' paycheck contributions be diverted for other purposes.  *Id.* at 221.  Again, though, in

this case Bjorkedal did not direct anyone at P&P to withhold either P&P's contributions or the

premiums deducted from employee paychecks.  *See Teamsters Health & Welfare Fund v. World*

*Transp., Inc.*, 241 F. Supp. 2d 499, 506 (E.D. Pa. 2003) (finding that a corporate officer was not

a fiduciary because he "was only minimally involved with the fund contribution procedure.").

At bottom, there is no evidence that Bjorkedal acted as a fiduciary with respect to the

Fund because there is no evidence that he "exercise[d] any authority or control respecting

management or disposition of its assets."  29 U.S.C. § 1002(21)(A).  Bjorkedal is therefore

entitled to summary judgment on the Trustees' breach-of-fiduciary-duty claim against him.

### D.  Piercing the Corporate Veil

The Trustees finally seek to pierce P&P's corporate veil and hold the Bjorkedals

personally liable for P&P's obligations to the Fund.  The Bjorkedals move for summary

judgment on this claim.  The Trustees contend that factual issues preclude summary judgment.

In *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509 (Minn. 1979), the

Minnesota Supreme Court established a two-prong test for determining whether the corporate

form should be disregarded and shareholders held personally liable for a corporation's debts.

Under the first prong, courts are supposed to examine a number of factors to determine whether

the corporation functioned as a "mere instrumentality" of the shareholders.  *Stoebner v.*

*Lingenfelter*, 115 F.3d 576, 579 (8th Cir. 1997); *see also White v. Jorgenson*, 322 N.W.2d 607,

608 (Minn. 1982).  Those factors include:

> insufficient capitalization for purposes of corporate undertaking, failure to
> observe corporate formalities, nonpayment of dividends, insolvency of debtor
> corporation at time of transaction in question, siphoning of funds by dominant
> shareholder, nonfunctioning of other officers and directors, absence of corporate
> records, and existence of corporation as merely facade for individual dealings.

*Victoria Elevator*, 283 N.W.2d at 512.  Under the second prong, courts ask whether the party

seeking to pierce the corporate veil has established that such piercing is necessary to avoid "an

element of injustice or fundamental unfairness."  *Id.*

It is important in this case — as it is in all veil-piercing cases — not to lose sight of the

forest for the trees.  It does not take a complicated multi-factor test, but only a little common

sense, to recognize that P&P was a "real" corporation and not merely a "facade" to cover the

personal dealings of its shareholders.  P&P and its predecessors were in business for 35 years.

They employed hundreds of workers, sold thousands of products to clients ranging from 3M to

Pillsbury, and collected tens of millions of dollars in revenues.  Bjorkedal Dep. 21, 42, 45-46;

Foster Dep. 16, 69.  At their high point, the Nordic companies combined had about 160

employees, Perkins Dep. 34, and annual revenues of approximately $25 million, Vander Plaats

Dep. Ex. 2 at D00237.  It would be truly extraordinary to pierce the veil of such a corporation.

The Trustees — eager to ignore the forest and focus on the trees — devote most of their

attention to the first prong of the *Victoria Elevator* test.  That is unsurprising.  Those seeking to

pierce corporate veils often rely heavily on the first prong, for it is a rare corporation —

especially small corporation — that can pass every one of the first prong's tests with flying

colors.  In this case, for example, the Trustees point out that P&P never paid dividends to

shareholders and that Bjorkedal was unable to produce meeting minutes for most of P&P's

corporate history, although he insisted that such minutes once existed.

-24-

These facts do not amount to much, though, even when viewed in isolation.  The Trustees' own expert conceded that it is rare for small closely-held corporations to pay dividends because such payments would in effect be double-taxed.  Tautges Dep. 136.  The fact that P&P did not pay dividends shows only that its officers were smart, not that P&P was a facade.  Moreover, the undisputed testimony from multiple witnesses was that P&P did in fact maintain corporate minute books and hold shareholder and director meetings.  Betty Dep. 49, Vander Plaats Dep. 21-22, Bjorkedal Dep. 29-30.  It is true, as the Trustees point out, that there was a relatively brief period of time shortly before the Bjorkedal family bought out the Jacobson family when the families were not getting along, the company was in turmoil, and no meetings were held.  Foster Dep. 41-42.  But P&P and its predecessors were in business for 35 years and observed corporate formalities for almost all of those 35 years.  The short-term glitch cited by the Trustees is almost meaningless against that backdrop.  It certainly does not suggest that P&P functioned as a "mere instrumentality."

The Trustees also claim that the relationship between P&P and the buildings constituted an impermissible blend of P&P's corporate business with the Bjorkedals' personal business.  The Trustees stress that P&P did not pay fair market rent and that the parties would disregard lease terms at times.  This sounds sinister until one realizes that, to the extent that formalities were not observed, it inured entirely to the benefit of the corporation.  Rent was indeed not set at fair market value; it was set *below* fair market value.  And the terms of the lease were indeed sometimes ignored; when cash was tight at P&P, the Bjorkedals would sometimes allow the company to skip rent payments.  (The Bjorkedals would then have to make mortgage payments out of their own pockets.)  It is a measure of the Trustees' desperation that they have to rely on

the fact that *P&P* siphoned money from the *Bjorkedals* in arguing that the Bjorkedals should be held personally liable for P&P's debts.

The Trustees make much of the fact that P&P took deductions on its corporate tax returns for rent payments that it was supposed to make to the Bjorkedals under the lease, even if the company skipped some of those payments.  At the same time, the Bjorkedals reported as income on their personal tax returns only the rent payments that they actually received from P&P.  If this is true, it suggests, at most, that P&P's accountants made an error — an error that redounded to the benefit of the corporation, not the Bjorkedals.  Moreover, the Trustees cite no evidence that the Bjorkedals were even aware of P&P's tax treatment of its lease payments.  Most importantly, what any of this has to do with piercing the corporate veil is not apparent.

In a related argument, the Trustees claim that the Bjorkedals misused corporate funds in connection with certain condominium units at the Chateau LeVeaux development on Lake Superior.  According to the Trustees, these units were supposed to be used to entertain P&P's clients, but the mortgages on the units and other expenses incurred in connection with the units were actually paid by funds drawn from the Jacobson-Bjorkedal Building Account.  Even worse, according to the Trustees, money from this account was used to pay for Vander Plaats's unit, which he owned personally and which was not used for business purposes.

The Trustees studiously avoid mention of the single most relevant fact:  The money in the Jacobson-Bjorkedal Building Account belonged to the Bjorkedals and the Jacobsons personally. It was their money.  They could do whatever they wanted with it.  Once again, the Trustees are left complaining that the Bjorkedals used their personal funds to help subsidize P&P.  But veil-

-26-

piercing is intended to prevent shareholders from ripping off others, not to prevent shareholders from ripping off themselves.

At one point, the Trustees claim that P&P "financed any shortfall between the funds generated from Chateau LeVeaux rental income and the payments for mortgages and expenses on the units." Pls.' Mem. Opp. Defs. Summ. J. 14. An examination of the evidence cited in support of this claim indicates that the Trustees are simply referring to the fact that the money in the Jacobson-Bjorkedal Building Account was derived from lease payments made by P&P. *See* Tautges Dep. Ex. 1 at 12 ("Given that the Nordic entities made lease payments according to Buildings bank needs, Chateau LeVeaux relied upon the Nordic entities to finance this shortfall."). There was nothing suspicious about those lease payments. As the Court has noted repeatedly, the Bjorkedals and Jacobsons owned the buildings; P&P and its predecessors occupied the buildings; and, to the extent that the rental agreements did not represent arm's-length transactions, they saved P&P money at the expense of the Bjorkedals and Jacobsons. There is no evidence that P&P paid a dime more in rent than was fair, nor that the Bjorkedals used the rent payments to improperly siphon one dime from P&P.

The Trustees next argue that P&P was undercapitalized when it was formed in 2002. As the Trustees know, however, P&P was created by the merger of the Nordic predecessors. The Trustees do not contend that those predecessors were undercapitalized when they were founded, when Vander Plaats signed the Adoption Agreement, or at any other time, except when the companies began to suffer financial reversals in the late 1990s. As other courts have observed, it is always possible to contend that a company that goes bankrupt was undercapitalized when it went bankrupt. *See Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863, 868 (Minn. 1981); *Ass'n of*

*Mill and Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 450 (Minn. Ct. App. 1996).  In light of P&P's lengthy existence as a successful and stable business, the fact that P&P ultimately went bankrupt does not suggest that it was an undercapitalized shell.  Sometimes, businesses just fail.

In sum, even when the Court focuses on the *Victoria Elevator* trees instead of the *Victoria Elevator* forest, the Trustees have little basis for arguing, under *Victoria Elevator*'s first prong, that the P&P corporate veil should be pierced.  This is not to say that the record of P&P and the Bjorkedals was unblemished.  As noted, there was a short period of time during which some corporate formalities were not observed.  Also, when Vander Plaats or other corporate employees devoted time to the buildings (such as by writing checks on the Jacobson-Bjorkedal Building Account to make mortgage and tax payments), the Bjorkedals and Jacobsons should have reimbursed P&P for their time.  In context, though, these are isolated and minor anomalies. They would not allow a reasonable jury to find that P&P and its predecessors existed "as merely facade for individual dealings." *Victoria Elevator*, 283 N.W.2d at 512.[5]

---

[5]The testimony of Foster — who in no way can be accused of harboring a bias toward Bjorkedal, with whom she had a falling out — speaks volumes about the fact that P&P was not merely a facade for Bjorkedal's personal dealings.  Foster testified:

> Ole . . . knew that he couldn't get away with stuff.  If he ever tried to take money for himself personally, I stopped him from doing that.  And he never did because he knew that I'd just flat out say no and I'd get in his face and tell him he wasn't allowed to do that.  So he may have had veto power in title, but I would really — I drove it, he didn't.

Foster Dep. 78.  This hardly paints a picture of a shareholder using a corporation as his personal piggy bank.

Even if the Trustees could make a better showing under *Victoria Elevator*'s first prong, the Bjorkedals would be entitled to summary judgment under the second prong.  That prong requires the Trustees to demonstrate "an element of injustice or fundamental unfairness" that compels the piercing of the corporate veil.  "To satisfy this portion of the test, 'proof of strict common law fraud is not required, but, rather, evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner must be presented.'"  *White*, 322 N.W.2d at 608 (quoting *W. Concord Conservation Club, Inc. v. Chilson*, 306 N.W.2d 893, 898 n.3 (Minn. 1981)).

There is not a scintilla of evidence that the Bjorkedals operated P&P or any of its predecessors "as a constructive fraud or in an unjust manner."  In contrast to the typical veil-piercing case in which the owner is accused of siphoning funds from the corporation, here it was P&P that siphoned funds from the Bjorkedals.  In 2001, Bjorkedal loaned between $400,000 and $500,000 of his own funds to Nordic Press.  Foster Dep. 117.  Bjorkedal was never repaid, save for a handful of interest payments.  Foster Dep. 112.  To enable P&P to obtain financing from a new bank in 2002, Bjorkedal personally guaranteed P&P's debt and pledged personal property that he owned in Buffalo, Minnesota.  Foster Dep. 31-32.  As the company's financial condition worsened, Bjorkedal stopped taking his salary and paid business expenses out of his own pocket.  Foster Dep. 111-12.  In June 2003, Bjorkedal put an additional $300,000 to $350,000 of his own money into the company.  Foster Dep. 71, 117.  Bjorkedal also on occasion contributed money to the Jacobson-Bjorkedal Building Account to cover mortgage payments when P&P could not pay its rent.  Foster Dep. 118-19.  All told, Bjorkedal put roughly $1.5 million of his own funds into P&P as the company struggled to survive.  *See* Defs.' Mem. Supp. Summ. J. 19 (chart

-29-

summarizing evidence of Bjorkedal's cash and other contributions); *see also* Foster Dep. 119 (stating that Bjorkedal put "far, far more funds in than out" of the corporation).

Obviously, this is not a case in which Bjorkedal recklessly conducted his personal business while hiding behind a corporate shell. P&P and its predecessors were indisputably "real" corporations that, over 35 years, conducted a "real" business. Moreover, Bjorkedal appears to have been an honest and dedicated owner. Far from siphoning corporate money that could have been used to pay the Fund, Bjorkedal instead poured hundreds of thousands of dollars of his own money into the corporation in a desperate effort to save the business and, not incidentally, save the jobs of the union members whose representatives are now suing him. The fact that Bjorkedal was ultimately unsuccessful meant that P&P was unable to pay its obligations to the Fund, just as it was unable to pay its obligations to many others, including Bjorkedal himself. That was unfortunate for all concerned, but it does not justify piercing the corporate veil and holding the Bjorkedals personally liable for P&P's debts.[6]

_____

[6]The Trustees contend that, in addition to their veil-piercing claim under state law, they have a separate "alter ego" claim under ERISA. They further contend that the Bjorkedals have failed to move for summary judgment on this federal claim. Pls.' Mem. Opp. Defs.' Mot. Summ. J. 28.

As an initial matter, it does not appear that this "alter ego" theory was plead properly, at least insofar as it is supposed to be distinct from a veil-piercing theory. The Trustees' amended complaint includes a single count labeled "alter ego/piercing the corporate veil," Am. Compl. 11, and wraps up this count by alleging that "[p]iercing the corporate veil is necessary to avoid injustice o[r] fundamental unfairness," Am. Compl. ¶ 58. Given that, like the amended complaint, courts frequently use these terms interchangeably, *see Stoebner*, 115 F.3d at 579-80, it would be a stretch to find that the Bjorkedals were on notice that "alter ego" was a separate claim arising under federal law.

Even if the Trustees had properly plead their "alter ego" claim, the test for "alter ego" under ERISA does not differ significantly from the test for piercing the corporate veil under *Victoria Elevator. See Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors,*

*E.  Attorney's Fees*

As the prevailing party, the Bjorkedals seek attorney's fees and costs pursuant to 29

U.S.C. § 1132(g)(1), which provides:  "In any action under this subchapter . . . by a participant,

beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and

costs of action to either party."  Whether to award fees is discretionary; there is no presumption

that the prevailing party will recover its fees.  *Cf. Martin v. Ark. Blue Cross & Blue Shield*, 299

F.3d 966, 971-72 (8th Cir. 2002) (rejecting presumption in favor of prevailing plaintiffs).  In

*Lawrence v. Westerhaus*, 749 F.2d 494 (8th Cir. 1984) (per curiam), the Eighth Circuit set forth

the factors that a court should consider in weighing whether to award attorney's fees under

§ 1132(g)(1):  (1) the opposing party's culpability or bad faith; (2) the opposing party's ability to

satisfy an award of attorney's fees; (3) whether a fee award could act as a deterrent; (4) whether

the prevailing party sought to benefit all participants and beneficiaries of an ERISA plan or to

resolve a significant legal question; and (5) the relative merits of the parties' positions.

*Lawrence*, 749 F.2d at 496.

All of these factors — save, perhaps, the last one — counsel against an award of fees to

the Bjorkedals.  The Trustees have made a lot of weak arguments, but, as best as the Court can

---

*Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997).

> The alter ego doctrine as developed under corporate law provides that the legal
> fiction of the separate corporate entity may be rejected in the case of a corporation
> that (1) is controlled by another to the extent that it has independent existence in
> form only and (2) is used as a subterfuge to defeat public convenience, to justify
> wrong, or to perpetuate a fraud.

*Id.*  The Bjorkedals are thus entitled to summary judgment on this claim for the same reasons
that they are entitled to summary judgment on the Trustees' veil-piercing claim.

tell, they never acted in bad faith in their dealings with P&P or the Bjorkedals. Moreover, the Trustees obviously brought this lawsuit not to benefit themselves, but to benefit the Fund as a whole. There is no bad conduct to deter. At the same time, awarding fees to the Bjorkedals could chill other ERISA plaintiffs from seeking to enforce their rights. A fee award would also deplete the resources of the Fund, which would undermine the major goal of ERISA: protecting the interests of plan participants.

An award of fees against a losing ERISA plaintiff is a "rather extraordinary remedy," *Owen v. Wade Lupe Const. Co.*, 325 F. Supp. 2d 146, 156 (N.D.N.Y. 2004). The circumstances of this case do not compel such an "extraordinary" award. The Bjorkedals' motion for attorney's fees and costs is therefore denied.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motion for summary judgment [Docket No. 31] is GRANTED in part and DENIED in part as follows:

    a.    Defendants' motion is DENIED with respect to their request for attorney's fees and costs; and

    b.    Defendants' motion is GRANTED in all other respects.

2. Plaintiffs' motion for partial summary judgment [Docket No. 28] and amended motion for partial summary judgment [Docket No. 37] are DENIED.

3. Plaintiffs' amended complaint [Docket No. 18] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  December  6,  2006                    s/Patrick J. Schiltz_____
                                              Patrick J. Schiltz
                                              United States District Judge